**Sherry H. LONG, individually, et al., Plaintiffs,**

**v.**

**BOARD OF EDUCATION OF JEFFERSON COUNTY, KENTUCKY, et al., Defendants.**

**No. Civ.A. 3:99CV–627–H.**

United States District Court, W.D. Kentucky.

Nov. 14, 2000.

Sherry H. Long, Louisville, KY, for Plaintiffs.

Michael K. Kirk, Wyatt, Tarrant & Combs, Louisville, KY, for Defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Plaintiffs are students and parents of students at Atherton High School, a part of the Jefferson County Public Schools. They allege that the Atherton student dress code violates rights guaranteed by the First Amendment, the Fourteenth Amendment, the Americans with Disabilities Act ("ADA"), and 42 U.S.C. § 1983. Specifically, Plaintiffs say that the dress code violates their right to free speech, free exercise of religion, substantive due process, procedural due process, and equal protection. Defendants move for summary judgment on all of these claims.[1]

This case requires the Court to consider the circumstances under which school officials may regulate student dress to create a particular educational atmosphere and to discourage gang presence in schools. This is a more unsettled question than one might think. Neither the Supreme Court nor the Sixth Circuit have explored fully these precise issues. Nevertheless, after thorough consideration, this Court concludes that the Atherton dress code falls within that discretion allowed school officials in regulating the learning environment.

---

1. The Defendants are the Jefferson County Board of Education (the "Board"), its Superintendent, Stephen Daeschner, the Atherton High School 2000–2001 School Based Decision Making Council, and John Hudson, the principal of Atherton High School. The Board and Daeschner have made strong arguments that each should be dismissed because neither had a part in adopting or enforcing the Dress Code. In fact, Kentucky statues prohibit the Board from interfering in many of the SBDM Council's decisions and policies. KRS 160.345(9). For purposes of this Memorandum Opinion, the Court addresses the central substantive issues and refers to the Defendants collectively.

## I.

The relevant facts are mostly undisputed. The Atherton High School School-Based Decision Making Council (the "SBDM Council") is a statutorily mandated school council that is responsible for setting school policy to "provide an environment to enhance students' achievement and help the school meet its goals." KRS 160.345(2)(c)(1). The Atherton Climate and Safety Task Force (the "Task Force") is a parent/teacher subcommittee of the SBDM Council.

A Task Force member and Assistant Principal Kirk Lattimore, who is responsible for student discipline, first raised the problems associated with student dress. Lattimore had witnessed conflicts between students caused by students making fun of each other over attire. He saw evidence of gang members among Atherton students in the clothing students wore, in gang symbols carved or painted in various locations around the school, and in hand signals appearing in yearbook pictures. Others such as teacher Kelly Garrett (another Task Force member) also saw signs of gang activity at Atherton. The Task Force investigated and considered the dress code concept for several years before making a recommendation to the SBDM Council.[2] Thereafter, in the spring of 1999, the Task Force recommended the new dress code to the SBDM Council. It identified the need to address the problem of gangs at Atherton, promote student safety, prevent student-on-student violence due to disputes over attire, and enable school officials to more easily identify nonstudents and intruders. The SBDM Council considered these proposals as a practical solution to these perceived problems. It adopted the dress code which is now challenged (the "Dress Code").

The Dress Code is quite comprehensive.[3] It limits the clothing students may wear as well as the manner of their wearing it. The Dress Code requires certain styles and colors of clothing. It prohibits logos, other than official Atherton logos; shorts; cargo pants; jeans; and other specified fabrics. It prohibits medallions and necklaces outside the uniforms and requires closed heel and toe shoes. Dress Code violations may lead to disciplinary sanctions ranging from detention to school suspension. School officials have sanctioned Plaintiffs for numerous Dress Code violations.

Plaintiffs want to wear clothes of their own choice, including shirts with logos of athletic teams and pictures of small animals. Moreover, Plaintiffs believe that the Dress Code is unnecessary. They also doubt that it will be effective in achieving its supposed goal. These disputes, howev-

2. The Task Force first proposed a standardized dress code as a solution to these problems in June 1997. According to Lattimore, the Council declined to enact a stricter dress code at that time and suggested that the Task Force find other ways to deal with the issue of gangs at Atherton. A parent representative of the Council proposed a policy statement which directed the Task Force to review the existing dress code, present several dress code options to the Council with explanations of their advantages and disadvantages, and recommend which option it thought was the best and most practical. The Council adopted this policy statement in November 1997.

The Task Force then visited other high schools in the district which had restrictive dress codes to investigate the rationale for those dress codes and their implementation, enforcement, and effectiveness. The Task Force also conducted a survey of teachers, parents, and students regarding their support for a new more restrictive dress code. A majority of teachers supported the idea of a new more restrictive dress code, a majority of the students were opposed, and the small percentage of parents who responded were opposed.

3. The 1999 dress code is set forth in full in Appendix A (the "Dress Code"). In June 2000 the SBDM installed a new dress code, which modified the one which is the subject of this case. The 2000 Dress Code is set forth in Appendix B. Because Plaintiffs have not amended their complaint to include the 2000 Dress Code, it may be at issue only as part of Defendants' continuing conduct. The 2000 dress code, however, does not change the legal analysis or conclusions in this case.

er, are not of sufficient weight to affect the First Amendment analysis.

## II.

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in the light most favorable to the non-movant. *Id.* The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242–43, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the non moving party." *Id.* at 252, 106 S.Ct. 2505.

## III.

To succeed on their section 1983 claims, Plaintiffs must show the deprivation of a "right secured by the Constitution and laws of the United States, [that] the deprivation was caused by a person acting under color of state law, and [that] the deprivation occurred without due process of law." *Dean v. Earle*, 866 F.Supp. 336, 339 (W.D.Ky.1994) (citing *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994)).

Plaintiffs claim that the Dress Code abridges their First Amendment right to freedom of speech by preventing expressive conduct through the choice of school attire. While neither the Supreme Court nor the Sixth Circuit has considered a case precisely like this one, each has said enough to identify the important considerations.

■ At the threshold the Court must determine whether the Dress Code implicates an expressive activity which the First Amendment protects. Plaintiffs do not seek to express a particular message either directly or indirectly. They merely want the right to wear clothes of their own choosing. To be sure, the right to wear clothes of one's own choosing has an expressive element but it is not "akin to 'pure speech.'" *See Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *Tinker* expressly distinguished an armband symbolizing protest of the Vietnam war from regulations that relate to "the length of skirts or the type of clothing" worn by students. *Id.* at 507, 89 S.Ct. 733. Even though it is not pure speech, Plaintiffs' expression does have constitutional protection. The choice of one's own clothes is expressive conduct more of the sort considered in *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (nude erotic dancing); *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (flag burning); and *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning a draft card to protest the Vietnam War). To this extent, the Dress Code does reach expressive conduct under the First Amendment.

■ The Dress Code's true purpose dictates the appropriate level of constitutional scrutiny:

> If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the 'less stringent' standard from *O'Brien* for evaluating restrictions on symbolic speech. If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard.

*Pap's A.M.*, 120 S.Ct. at 1391 (citations omitted). Therefore, this Court must determine whether the Dress Code regulation aims at the primary or secondary effects of the expression.

The primary effects of the expression are those directly related to the audience, "i.e. the effect on the audience of watching

nude erotic dancing." *Pap's A.M.*, 120 S.Ct. at 1392. Its secondary effects are the impacts on "public health, safety, and welfare." *Id.* The "less stringent level" of *O'Brien* review applies to ordinances regulating erotic nude dancing in nightclubs because those ordinances aimed at the "secondary effects" of the expressive activity—crime, disorderly conduct and prostitution—and were therefore content neutral. *Id.* (expressly rejecting view that regulation aimed at deleterious effects of expressive conduct necessarily suppresses the message and is therefore not content neutral); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

■ The cases concerning nude dancing, draft card burning or flag burning are by no means perfect analogies. Our circumstances are a little less like speech and somewhat more like conduct. Nevertheless, these cases provide some important guidance. In much the same way as the ordinances in *Pap's A.M.* and *Barnes*, the Dress Code aims at the "secondary effects" of student dress. The Task Force and the SBDM Council each believed that the Dress Code would help reduce violent gang activity,[4] ease tensions between students who fight over attire, aid school officials in identifying campus intruders, and would promote student safety in general. The Dress Code addresses precisely those purposes in a manner that is unrelated to the expressive nature of students' choice of attire. No evidence suggests that the Dress Code intended to suppress the particular mode or message of any expressive conduct.[5] Because the Dress Code is a content neutral infringement on expressive conduct, the Court will apply the *O'Brien* test.

### IV.

In *O'Brien*, the Supreme Court condoned regulation of expressive conduct "if it furthers an important or substantial government interest; if the interest is unrelated to the suppression of free expression; and if the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. 1673. The nature of the forum—in this instance the school house setting—establishes the importance of the government's interest so prevalent in the first two prongs of the *O'Brien* test. This Court sees a consistent thread in the *Tinker* Court's finding that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students," 393 U.S. at 506, 89 S.Ct. 733, and the *Fraser* Court's suggestion twenty years later that a high school forum need not allow the full range of expressive activity that students enjoy outside of school grounds. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (stating that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings"). Without denying students protec-

4. Insofar as the Dress Code is targeted as gang activity, the pleadings make clear that school officials are targeting the violent and disruptive nature of gangs, not innocent group affiliation.

5. Plaintiffs contend that because the Dress Code permits Atherton High School logos while excluding all other logos it is not viewpoint neutral. The school claims the logo policy helps school officials identify non-student intruders on Atherton's campus. Whatever marginal expression wearing the Atherton logo implicates, it does not rise to the level of expression to implicate concerns of viewpoint neutrality. In *Boroff v. Van Wert City Board of Education*, 220 F.3d 465 (6th Cir.2000), the dissent suggested that "a reasonable jury might infer that the school engaged in viewpoint discrimination" where school officials prohibited a student from wearing a t-shirt with a religiously offensive image. In our case, the argument for finding viewpoint discrimination is weaker than *Boroff*. *Id.* at 472. Unlike *Boroff*, the Court finds nothing in the evidence of this case from which a reasonable jury might infer that Defendants' real intent was to suppress Plaintiffs' opinions.

tion. of their basic constitutional rights, these cases recognize that the very notion of education implies the need to control the atmosphere in which learning occurs.

The Sixth Circuit recently reviewed these issues in *Boroff v. Van Wert City Board of Education*, 220 F.3d 465, 467 (6th Cir.2000), where high school students challenged a school dress code which prohibited "clothing with offensive illustrations, drug, alcohol or tobacco slogans." The court's consideration of the school forum is instructive. It noted that high school students do not have the same rights as adults in other settings. Moreover, school officials have a right to control the speech or expression in public schools where such speech is inconsistent with the school's educational mission. *Id.* at 468–469. The unique characteristics of the school environment, therefore, allow school officials greater leeway to regulate expression in schools. *Id.* Thus, *Boroff* strongly endorses school officials' substantial interest in the educational atmosphere of schools.[6]

Applying the *O'Brien* test to this case, the Court concludes that school officials have an important and substantial interest in creating an appropriate learning atmosphere by preventing gang presence and limiting fights in schools. Further, the Court finds that school officials did not intend to suppress free speech.

### V.

Only the third prong of *O'Brien* remains for consideration. Neither the Supreme Court nor the Sixth Circuit have defined the precise standard for judging the discretion allowed school officials who incidentally restrict First Amendment freedoms to further an important and substantial interest. *Id.* at 377.[7] The relevant cases hardly create a seamless web of legal analysis. Notwithstanding this, it seems clear that the extent of discretion allowed school officials depends on the nature of the speech being infringed and the reasonableness of the regulation itself.

It is important that the Dress Code does not prohibit alternative and more specific student expression through badges, buttons or other means. The regulation of student dress in our case falls somewhere between the minimally disruptive symbolic speech in *Tinker* and the obscene, offensive speech in *Fraser* and *Boroff*. Since Plaintiffs seek to wear clothes that are neither obscene nor offensive, the link between the Dress Code and the school's

---

**6.** The Sixth Circuit affirmed summary judgment in favor of the school officials because their actions were not "manifestly unreasonable." *Id.* at 470.

**7.** Many state and federal courts considered similar issues in the early 1970's involving challenges to regulations of student hair length. *See* Recent Case, 84 Harv.L.Rev. 1702 (1971) (summarizing various approaches taken by courts in "hair cases"). Although several of these cases were unclear as to whether long hair was protected by the First Amendment right to free speech or the Fourteenth Amendment right to privacy, the issue of the degree of deference owed to school officials in proscribing non-conformity is the same issue presented here. While courts were split over this issue in these cases, *see id.*, the Sixth Circuit took the more deferential path in *Jackson v. Dorrier* 424 F.2d 213 (6th Cir.1970) (upholding hair length regulation where district court found, "the evidence unquestionably establishes that the regulation has a real and reasonable connection with the successful operation of the educational system").

The Court can find only two cases which consider viewpoint neutral regulation of student dress. This Court's analysis finds more affinity with *Phoenix Elementary School District v. Green*, 189 Ariz. 476, 943 P.2d 836 (1997), where the court affirmed the trial court decision that a student dress reasonable in purpose and scope did not violate the First Amendment. This Court's view is different than that in *Jeglin v. San Jacinto Unified School District*, 827 F.Supp. 1459 (C.D.Cal. 1993), where the court declared that the school dress code violated the First Amendment because school officials could not show a substantial disruption or material interference with school activities. This opinion seems to require more of a factual showing to justify regulation of student dress.

educational environment is not as apparent as it was in *Fraser* or *Boroff*. On the other hand, the school's goal—maintaining a peaceful and focused educational atmosphere—is viewpoint neutral and is clearly within the school's educational mandate. The Court concludes that such a regulation does not offend the First Amendment where it furthers the school's educational mission and where the scope of the regulation is reasonably related to that goal.

The Dress Code clearly aims to create a safe and peaceful environment where school officials perceive fewer threats to student safety and school order. Few would dispute that these interests bear a close relationship to the school's educational mission and that this goal is important. It is hardly surprising that some school officials, parents, and students dispute the severity of the perceived problems or the need for any dress code.[8] Nor is it surprising that teachers, parents, and students disagree about whether the Dress Code is more important than the educational benefits associated with greater freedom of expression through dress. However, our courts have traditionally left these types of choices to the reasonable discretion of school officials. Clearly, Defendants have established an objective basis for adopting the Dress Code. The Court's role should be to determine whether a reasonable basis existed for school officials' judgment, not to second guess or micromanage it.

The SBDM Council adopted the Dress Code after extended careful deliberation. The lengthy adoption process provides further evidence that the Dress Code is reasonably related to a legitimate educational objective. Consequently, it is unnecessary to require the school to show that the Dress Code was necessary to stop an actual disruption. *Cf. Jeglin v. San Jacinto Unified School Dist.*, 827 F.Supp. 1459, 1462 (C.D.Cal.1993) (striking down dress code where school district failed to present sufficient evidence showing gang problem

existed). Under such circumstances, this Court is careful not to replace the council's judgment of the Dress Code's reasonableness with its own. The Court concludes that Defendants' adoption of the Dress Code was reasonable and, therefore, does not violate Plaintiffs' rights under the First Amendment of the United States Constitution.

In upholding the present Dress Code it is important to note that some questions are unanswered. It is not entirely clear that a school must find that an actual problem exists before taking action or that a school must undertake the lengthy legislative process undertaken in the present case. School officials must anticipate problems before they arise and must sometimes respond quickly to potential disruptions. On the other hand, students do not lose their First Amendment freedoms at the schoolhouse door. For school officials, balancing these sometimes conflicting rights and duties can be a difficult task. Here, they have struck a reasonable balance.

### VI.

For the following reasons, Plaintiffs substantive due process, procedural due process, free exercise, equal protection, and ADA claims also fail.

First, the Supreme Court has repeatedly held, and as recently as this year the Sixth Circuit has recognized, that "substantive due process is not to be used as a fallback constitutional provision when another provision or amendment (in this case, the First Amendment) directly addresses the subject." *Boroff v. Van Wert City Bd. of Ed.*, 220 F.3d 465, 471 (6th Cir.2000) (citing *Conn v. Gabbert*, 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)). Further, to state a claim under substantive due process a fundamental right must be implicated. The Sixth Circuit has explicitly rejected the claim that the

8. It is not clear that anyone saw actual gang violence.

choice of clothing is a fundamental right.[9] *Id.*

■ To state a procedural due process claim in a school discipline context plaintiffs must show that they have been deprived of a property right without a fair hearing or decision making process. *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir.1996). A student facing suspension from school has a property interest in a free public education. *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (recognizing "a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause"); *Buchanan*, 99 F.3d at 1359. For a suspension of ten days or less "rudimentary procedures such as an informal give-and-take between student and disciplinarian will satisfy procedural due process requirements." *Id.* (citing *Goss*, 419 U.S. at 582–84, 95 S.Ct. 729). "[O]nce school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands." *Id.* (citations omitted).

■ Here, there is no allegation that Plaintiff students were ever suspended for more than ten days for a Dress Code violation. They do not allege that they were ever disciplined for a Dress Code violation without having some school official view their dress, discover that they did not comply with the Dress Code, and then discipline them. Under the controlling standards of *Buchanan* and *Goss*, this procedure is all that the Due Process Clause requires.

■ To successfully bring an equal protection claim based on gender discrimination plaintiffs must be able to prove that

the challenged regulation has both a discriminatory impact and a discriminatory purpose. *See Personnel Adm'r v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Here, the Dress Code is gender neutral on its face and Plaintiff has not alleged any fact that could lead to the conclusion that school officials intended to create a gender based classification in enacting the Dress Code. Therefore, the Dress Code must survive an equal protection challenge if it is rationally related to a legitimate government objective. *See id.* As explained above, both of these elements are present here.

Finally, Plaintiffs' claims brought under the ADA and the Free Exercise Clause appear to have been abandoned since they are omitted from Plaintiffs' Response To Defendant's Motion for Summary Judgment and were not presented during a conference in chambers.

The Court will enter an Order consistent with this Memorandum Opinion.

### APPENDIX "A"

**The 1999 Dress Code provides:**

Refer to the following for permissible clothing. Items not listed are inappropriate and not allowed. Clothing must be sized to fit.

**Shirts**—must be tucked inside pants or skirts with belt showing, no blousing

**Long/Short Sleeved Polos**

—Collar

—2 to 5 button placket (top button open only)

—Solid white or black

—"Official" Atherton white, gold, or mulberry

—no logos other than "official" Atherton

**Long/Short Sleeved Dress Shirt with a Collar**

---

9. Plaintiff Parents' claims that the Dress code deprives them of a fundamental right by interfering with the parent-child relationship also fails for this reason.

—Cotton or cotton blend (like an Oxford cloth shirt)

—button from top to bottom (only top button may be open)

—Solid white with no logos

T–Shirts

—Solid white (no writing or colors)

—Worn under polo shirt or oxford only

Turtlenecks

—Solid white

—Worn under approved long sleeved shirts or sweatshirts

**Sweatshirts**—must be worn over collared polo, oxford, or turtleneck

—Crew neck only

—Must be banded at the bottom

—Solid white or black

—"Official" Atherton white, gold, or mulberry, or gray

—No logos other than "official" Atherton

—No hoods

—Collar of shirt or turtleneck must be showing

**OTHER**

—No coats or jackets

—No garments tied around body

—No fleece

**Pants**—trouser-style pants; cotton twill, cotton/polyester blend, or wool

—Khaki or black only

—Belt loops

—Visible belt

—Fastened with standard brown or black belt with standard buckle

—No stretch polyester or spandex

—No sagging (pants must be worn at waist)

—No cargo or patch pockets (pockets sewn on outside of pants)

—No jean cut rivets, or denim

—No shorts

**Skirts**—cotton twill, cotton/polyester, or wool

—Khaki or black only

—"A" line, straight or pleated

—Fastened with standard brown or black belt with standard buckle if looped

—Length must pass Flamingo test (Stand with both feet flat on the floor. Lift one foot and bend the leg at a 90 degree angle; the other leg must remain straight. if the back of the skirt touches the calf of the bent leg, the skirt is long enough.  If the skirt does not touch the calf, the skirt is too short.)

—No stretch polyester or spandex

—No culottes, skorts, denim, or patch pockets

**Shoes**

—Closed toe and heel

**Jewelry, Misc.**

—No medallions/necklaces worn outside uniform shirt

—No visible key chains

—No jewelry with drug-, alcohol-, or violence-related information

—No jewelry that can be used as a weapon

—No body piercing except ears, earrings in earlobes only

—No visible tattoos

—No sweatbands, bandanas, combs/picks, curlers in hair

—Hair must be natural color

—Nothing hanging out of pockets

No clothing or jewelry should be worn in any manner representative of gang affiliation.

**DRESS CODE VIOLATIONS/CONSEQUENCES**

Students not in compliance with dress code policies will be referred to the administration.  Parents may be notified and asked to bring appropriate clothing to the student.

**1st Offense**—If violation is corrected, student will be assigned one day detention and sent back to class. If not corrected, student will spend the rest of the day in ISAP.

**2nd Offense**—If violation is corrected, student will be assigned two days detention and sent back to class. If not corrected, student will spend the rest of the day and also the following day in ISAP.

**3rd Offense**—Student will be sent home.

**4th Offense**—Student will be suspended until parent conference, which cannot be held on the day of the suspension. (ISAP may not be substituted for the suspension.)

**The administrators will make final decisions on what is acceptable.**

The School Climate and Safety Task Force recommends that the administration authorize specified dress down days as incentives for attendance, punctuality, etc. (For example students might be allowed to wear jeans on a specified Friday for reaching the district goal for our school on high attendance day.)

### APPENDIX "B"

**The 2000 Dress Code:**

Dress or Polo Collared Shirts, Turtle and Mock Turtle Neck Shirts, Sweaters, Vest, Banded Sweatshirts An approved solid colored collared shirt must be worn under all sweaters, vest and banded sweatshirts

**Solid Colors:**

Yellow, gold, navy blue, gray, Green, purple, maroon, mulberry, Pink, white, black.

(1) Shirt collars must be visible at all times.

(2) Shirts must be tucked in at the waist.

(3) Shirts must be buttoned appropriately.

(4) Tee-shirts worn as an undershirt must be of an approved solid color.

(5) All shirts and sweatshirts must have sleeves.

**No:**

Denim, hoods, logos (except Atherton), red, blue (other than navy blue), shirts without collars, spandex, untucked shirts, tee-shirts (unless worn as an undershirt), zippers.

**Females: Pants, shorts, dresses, skirts, jumpers.**

**Solid Colors: Khaki (sand, tan, olive), black or navy blue.**

(1) Approved colored collared shirt must be worn with jumpers, skirts, and shorts.

(2) Skirts, jumpers and dresses must pass "flamingo test."

(3) Shorts cannot be shorted than 6" above the mid-knee.

(4) Slits in skirts can be no more than 6" above mid-knee.

(5) Belts must be worn with clothes that have loops. Buckles should be of a standard size, no larger than 3" by 2".

(6) Dresses must have long or short sleeves.

**Males: Pants or shorts**

**Solid colors: Khaki (sand, tan, olive), black or navy blue**

(1) Shorts cannot be shorter than 6" above the mid-knee.

(2) Belts must be worn with all pants that have loops. Buckles should be of a standard size not to exceed 2" by 3".

**No: Bagging, sagging, bibs, cargo denim, holes, frays, jogging pants, rolled up pants, spandex, sweats, capri pants, clam digger pants, biker pants or nylon material.**

Stockings, socks or tights must be worn on legs and feet at all times. NO primary blue or any red allowed.

Shoes or sandals with a back or back strap are required for feet wear.

NO—clogs, flip flops, shower shoes, slippers or thongs.

**Other:**

NO—body piercing (except ear lobes); combs, picks or curlers in hair; drug, alcohol or violence related accessories, sweatbands, scarves, bandanas, skullcaps or any face or head coverings; items that could be used as a weapon; no medallions or necklaces worn outside of clothing; key chains worn outside of pants, skirts, jumpers or dresses; unnatural hair color or visible tattoos; nothing hanging out of pockets or tied around the body.

Clothing must be sized to fit.

Fleece—only "official" Atherton fleece allowed.

No coats or jackets worn or carried during school hours (7:40–2:20).

Accommodations for students with religious requirements will be made on an individual basis.

Accommodations for students with disabilities will be made on an individual basis.

Students with special conditions requiring special consideration should contact an administrator.

Any clothing deemed disruptive to the educational process is prohibited.

The principal or an assistant principal will determine spirit days and dress down days in accordance to student responsibility for following the dress guidelines.

The principal or assistant principals will make final decisions on acceptable dress.