# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KIMBERLY JACOBS; DONALD JACOBS;
LINDA ROWLEY; DWIGHT TERRY,
JR.; DWIGHT TERRY, SR.; SHANE
DRESSER; DONALD DRESSER; WENDY
DRESSER; LONA FINLEY; WHITNEY
ROSE; LYNN ROSE; DEANNA
WRIGHT,
       *Plaintiffs-Appellants,*

       v.

CLARK COUNTY SCHOOL DISTRICT;
MARGE APPUGLISE; SHIRLEY
BARBER; SUSAN BRAGER-WELLMAN;
DENISE BRODSKY; PENNY ELLIOT;
EMELIO FERNANDEZ, JR.; CARLOS
GARCIA; RUTH JOHNSON; LARRY
MASON; SHEILA MOULTON; DARLENE
RUSSELL; MARY BETH SCOW;
MILANA WINTER,
       *Defendants-Appellees.*

No. 05-16434

D.C. No.
CV-S-04-01490-
RLH

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, District Judge, Presiding

Argued and Submitted
March 8, 2007—Tempe, Arizona
Submission Vacated May 3, 2007
Resubmitted August 15, 2007

Filed May 12, 2008

Before: Michael Daly Hawkins, Sidney R. Thomas, and
Richard R. Clifton, Circuit Judges.

5177

Opinion by Judge Hawkins;
Dissent by Judge Thomas

**COUNSEL**

Allen Lichtenstein, General Counsel, ACLU of Nevada, Las Vegas, Nevada, for the plaintiffs-appellants.

C.W. Hoffman, Jr., Clark County School District, Office of the General Counsel, Las Vegas, Nevada, for the defendants-appellees.

**OPINION**

HAWKINS, Circuit Judge:

Public school districts across the country have increasingly turned to the adoption of mandatory dress policies, sometimes referred to as "school uniform policies," in an effort to focus student attention and reduce conflict. These policies are not without controversy, and many students, as well as their parents, find them offensive to their understanding of core First Amendment values. In a case of first impression in this circuit, we address just such a set of challenges and largely conclude that public school mandatory dress policies survive constitutional scrutiny.

## FACTUAL & PROCEDURAL HISTORY

In 2003, the Clark County School District ("the District") promulgated Regulation 5131 ("the Regulation"),[1] which created a standard dress code for all Clark County students[2] and established a means by which individual schools in the District could establish more stringent mandatory school uniform policies.[3] These uniform policies were to be established "for

---

[1]The Regulation was passed pursuant to section 392.458 of the Nevada Revised Statutes ("N.R.S. § 392.458"), which authorizes "[t]he board of trustees [of a Nevada school district] . . . , in consultation with the schools within the district [and] parents and legal guardians of pupils who are enrolled in the district, . . . [to] establish a policy that requires pupils to wear school uniforms."

[2]This dress code contained typical student dress provisions, such as prohibitions on wearing hats in class, wearing clothing that is obscene, disruptive, or hazardous to student safety, and wearing skirts that are too short. None of the plaintiffs challenge the constitutionality of this basic dress code.

[3]Significantly, in its original incarnation, the Regulation required any school considering a uniform policy to first conduct a parental survey. Only if at least 51% of the school's parents returned the surveys—and, of those responding, at least 70% favored the policy—could the policy be implemented.

the purpose[s] of increasing student achievement, promoting safety, and enhancing a positive school environment."[4]

A number of schools in the District instituted such uniform policies. For example, Liberty High School ("Liberty") instituted a policy requiring all students to wear "solid khaki-colored bottoms and solid-colored polo, tee, or button-down shirts (blue, red or white) with or without Liberty logos."[5] Kimberly Jacobs ("Jacobs"), then an eleventh-grader at Liberty, repeatedly violated Liberty's uniform policy (at least once by wearing a shirt containing a printed message reflecting her religious beliefs). As a result of these violations, Jacobs was repeatedly referred to the Dean's office and was ultimately suspended from school five times for a total of approximately twenty-five days. Although Liberty provided Jacobs with educational services during her suspensions[6]— and, in fact, Jacobs's grade point average improved during that time period[7]—Jacobs claims that she missed out on classroom interactions, suffered reputational damage among her teachers and peers, had a tarnished disciplinary record, and was unconstitutionally deprived of her First Amendment rights to free expression and free exercise of religion because of Liberty's enforcement of its mandatory school uniform policy.[8]

_____

[4]Although the second and third purposes were not expressly listed in the original version of the Regulation, they were listed in a revised version of the Regulation and, according to an unrebutted affidavit from the District's superintendent, were purposes of the Regulation from the outset.

[5]The other schools involved in this case implemented similar uniform policies, though most of these did not allow student clothing to contain a school logo.

[6]Her teachers apparently provided Jacobs with homework, corrected that homework, allowed her to take tests, and communicated with her via telephone and e-mail.

[7]Jacobs was not "penalized academically"; in fact, the undisputed evidence shows that her academic performance improved.

[8]Nor was Jacobs "forced to transfer to another school"; rather, she decided—as she is entitled to do—that she would rather attend a school without a dress code than comply with the dress code at Liberty.

Jacobs and her parents thus brought suit against the District and various individual defendants (collectively, "Defendants"), asking the court to: (1) declare N.R.S. § 392.458, the Regulation, and Liberty's mandatory school uniform policy unconstitutional as violating the First Amendment's Free Speech and Free Exercise clauses, as well as the Fourteenth Amendment's Due Process Clause; (2) expunge all related discipline from Jacobs's record; and (3) award her appropriate damages.[9] Without expressing any view on the constitutionality of Liberty's uniform policy or its authorizing regulation and statute, the district court granted Jacobs's motion for a preliminary injunction and enjoined Liberty from further disciplining or suspending Jacobs for failing to adhere to the policy.[10] Following this decision, the District slightly amended the Regulation, with the only significant changes being: (1) a relaxation of the amount of parental support needed to enact a school's uniform policy;[11] and (2) elimination of one portion of the Regulation about which the district court expressed "strong reservations."[12] Additionally, Liberty expunged all uniform-related discipline from Jacobs's record.

---

[9]Jacobs also alleged violations of Article 1, Section 9 of the Nevada Constitution and other provisions of Nevada law. Because Article 1, Section 9 of the Nevada Constitution is "coextensive [with] . . . the First Amendment to the United States Constitution," *S.O.C., Inc. v. Mirage Casino-Hotel*, 23 P.3d 243, 251 (Nev. 2001), and because none of the state law claims are at issue in this appeal, this decision focuses only on Jacobs's arguments under the United States Constitution.

[10]The preliminary injunction was based on the district court's finding that Liberty's uniform policy was likely implemented without complying with the original Regulation's parental survey requirements—a claim Plaintiffs have since abandoned. *See infra* Part IV (objecting to policy's implementation only insofar as it violated *due process*, not state law).

[11]Under the revised version of the Regulation, a school could implement a uniform policy if, of the parental survey responses it received, at least 55% expressed approval for the policy. A "minimum response rate" was no longer needed.

[12]This portion made an exception to the uniform policy for "nationally recognized youth organizations such as the Boy Scouts or the Girl Scouts." The district court's reservations were based on its tentative conclusion that that portion of the Regulation created a "content-specific clothing exception[ ]." *Compare infra* Part II.A.

Encouraged by Jacobs's success in obtaining a preliminary injunction—and concerned about the suit's viability after Jacobs had withdrawn from Liberty and moved to a new school district—a number of other District students and their parents (collectively, "Plaintiffs") joined the suit.[13]

Shane Dresser ("Dresser")—a student at Jim Bridger Middle School ("Bridger") at the time this suit was filed[14]—alleged, *inter alia*, that his right to free exercise of religion was violated when, after being denied a religious exemption from Bridger's uniform policy, he was forced to wear the required uniform. Dresser had applied for an exemption on the ground that his religion teaches its members to embrace their individuality and further teaches that, even though "uniformity can be accepted by an individual if they choose to do so by their own free will, . . . no one can force uniformity onto a person." Dresser's application was denied without explanation.[15]

Dwight Terry, Jr. ("Terry")—a student at Chaparral High School ("Chaparral")—alleged that, on at least five occasions, he was sent to the principal's office for the remainder of the school day for failing to wear the required school uniform. Neither the amended complaint nor any evidence in the record provides any additional information regarding Terry's violations. Specifically, the record does not indicate whether Terry's non-compliance was due to a religious objection, a

---

[13]Like Jacobs's original complaint, the amended complaint sought declaratory and injunctive relief, as well as appropriate damages.

[14]Dresser no longer attends Bridger and, as Plaintiffs' counsel conceded at oral argument, does not presently attend a school in the District with a mandatory uniform policy.

[15]The explanation given by the District's deputy superintendent for the denial of a similar application filed by Dresser's brother, Quinn (who is not a named plaintiff in this suit), was that the Dressers' religion did not require its members to wear certain items of clothing to school and that the Dressers made "no showing" that the uniform policy prevented their son from engaging in conduct that was required by his religion.

desire to communicate a particular message (either via his dress itself or via a printed message contained on his clothing), a desire to cause disruption in his school, or simple forgetfulness. Chaparral is not presently enforcing a school uniform policy.

Whitney Rose and John Does I & II—students at Frank E. Garside Jr. High School ("Garside") and Glen Taylor Elementary School ("Glen Taylor"), respectively—alleged that their due process rights were violated when their schools implemented school uniform policies without complying with the parental survey requirements included in the original Regulation.[16] Of these three students, only John Doe I continues to attend a District school with a mandatory uniform policy.

Defendants moved to dismiss Plaintiffs' amended complaint under Rule 12(b)(6). After advising the parties that Defendants' motion might be construed as one for summary judgment, and after the parties supplemented the record accordingly, the district court struck two provisions of the Regulation,[17] but otherwise granted summary judgment in favor of

---

[16]John Doe I also alleges that he was unconstitutionally forbidden from wearing a "Say No to Uniforms" button at school; however, as the district court properly found, this claim appears nowhere in the amended complaint and the brief treatment the subject was given in Plaintiffs' summary judgment filings was "insufficient to assert a cause of action meriting further discussion." *Jacobs v. Clark County Sch. Dist.*, 373 F. Supp. 2d 1162, 1174 n.3 (D. Nev. 2005).

[17]These provisions—which exempted students from complying with the uniform policies when doing so "violates [the] student's/parent's religion" and permitted school principals to "grant exceptions for designated spirit days, special occasions, or special conditions"—were found unconstitutional because they provided "almost unlimited discretion to school administrators." *See Jacobs*, 373 F. Supp. 2d at 1184 (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (free exercise clause violated when "unbridled discretion" given to enforcing authorities)). Defendants do not appeal these rulings, though—as discussed *infra* Part III.B—Plaintiffs argue that the district court's decision to strike the religious exemption on "excessive discretion" grounds solved one constitutional problem only by creating another.

Defendants, finding no other constitutional infirmity with N.R.S. § 392.458, the Regulation, or the individual schools' uniform policies. *See generally*, *Jacobs*, 373 F. Supp. 2d at 1162. Plaintiffs appeal this judgment.

## DISCUSSION

### I. Justiciability

**[1]** Before turning to the constitutional claims lodged against the District's school uniform policies, we must ensure that at least one plaintiff presents a justiciable "case or controversy" with respect to each constitutional claim. U.S. Const. art. III; *City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233 (9th Cir. 1980). For a plaintiff's claim to be justiciable, he or she must have standing to bring the claim, and the claim must not be moot. *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006).

A plaintiff has standing to challenge allegedly unconstitutional conduct as long as: (1) he or she has "suffered an 'injury in fact' "; (2) there is a "causal connection between the injury and the conduct complained of"; and (3) it is likely "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted). While standing is determined based on the facts "as they exist[ed] at the time the complaint was filed," *id.*, a case becomes moot—and, hence, non-justiciable—if the "requisite personal interest" captured by the standing doctrine ceases to exist at any point during the litigation. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980); *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002).

Although many of Plaintiffs' claims for declaratory and injunctive relief appear to be moot (as only one plaintiff continues to attend a District school that is currently enforcing a mandatory school uniform policy), Plaintiffs' amended com-

plaint seeks not only prospective relief, but also "appropriate damages." As this court clarified in *Bernhardt*, a "live claim for [even] nominal damages will prevent dismissal for mootness." 279 F.3d at 872. We thus examine each of Plaintiffs' constitutional claims to determine whether at least one plaintiff meets the three standing requirements and retains a "live claim for [at least] nominal damages." *See id.*

## A.   Freedom of Speech

Plaintiffs allege that the District's mandatory school uniform policies infringe upon students' free speech rights by preventing them from engaging in both constitutionally protected "pure speech" and constitutionally protected "expressive conduct," as well as by compelling them to "speak" in a particular manner.[18]

When a plaintiff alleges violation of a constitutional right, the Supreme Court has held that, even if compensatory damages are unavailable because the plaintiff has sustained no "actual injury"—such as an economic loss, damage to his reputation, or emotional distress—nominal damages are nonetheless available in order to "mak[e] the deprivation of such right[ ] actionable" and to thereby acknowledge the "importance to organized society that [the] right[ ] be scrupulously observed." *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986) ("Our discussion [in *Carey*] makes clear that nominal damages . . . are the appropriate means of 'vindicat-

---

[18]Although the district court did not address Plaintiffs' "compelled speech" argument in its decision, the argument was properly raised both to the district court and to this court; thus, we consider the argument on appeal. *Donovan v. Crisostomo*, 689 F.2d 869, 874 (9th Cir. 1982). We do not, however, consider Plaintiffs' argument that the uniform policies worked to foreclose to Plaintiffs an "entire medium of expression," *see City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994), as that argument *was not* properly raised to the district court. *Marx v. Loral Corp.*, 87 F.3d 1049, 1055 (9th Cir. 1996).

ing' [constitutional] rights whose deprivation has not caused actual, provable injury.").

**[2]** Here, while it is questionable whether Jacobs has presented sufficient evidence of actual damages to be entitled to compensatory relief[19]—and it is clear that Dresser has not even attempted to do so—this is not fatal to the justiciability of their claims. Jacobs has standing to bring a non-moot claim for nominal damages because she alleges an "injury in fact"— namely, deprivation of her First Amendment right to communicate a particular written message on her clothing—that was caused by Liberty's mandatory uniform policy and would be redressed if this court were to find the policy unconstitutional. *See RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1055 (9th Cir. 2002) (free speech case found justiciable based solely on plaintiffs' allegations that city regulation "prevent[ed] them from playing the music of their choice"). Similarly, Dresser has standing to bring a non-moot claim for nominal damages because he alleges "injuries in fact"— namely, deprivation of his First Amendment rights to engage in expressive conduct via his choice of clothing and to be free from compelled speech—that was caused by Bridger's mandatory uniform policy and, again, would be redressed if this court found that policy unconstitutional. *See id.*

Thus, although Jacobs and Dresser may be entitled to col-

---

[19]Jacobs alleges that, although her scholastic record did not suffer as a result of her repeated suspensions, she nevertheless suffered compensable reputational damage, as well as damages emanating from her missed classroom interactions. Defendants counter that Jacobs has put forth no admissible evidence of such damages. Although we note that Jacobs *did* put forth competent evidence that she was suspended for 25 days and that missing classroom time caused her some educational harm, we need not decide whether this evidence would, itself, be sufficient to support a claim for compensable damages. As explained below, even taking the facts in the light most favorable to Jacobs, none of Jacobs's constitutional rights were violated; thus, the district court properly dismissed Jacobs's suit at the summary judgment stage.

lect *only* nominal damages were they to succeed on their free speech claims, they nonetheless present justiciable challenges to all speech-related aspects of the District's uniform policy. *See Lujan*, 504 U.S. at 560-61; *Bernhardt*, 279 F.3d at 872; *RK Ventures*, 307 F.3d at 1055. The merits of these free speech claims will be discussed in Part II.

## B.   Free Exercise of Religion

**[3]** Plaintiffs also allege that the District's mandatory uniform policies prevented Jacobs and Dresser from freely exercising their respective religions. Again, these two plaintiffs have standing to assert non-moot claims for at least nominal damages because they allegedly sustained "injuries in fact" that were caused by their schools' uniform policies and would be redressed if the court found those policies unconstitutional. *See Lujan*, 504 U.S. at 560-61; *Bernhardt*, 279 F.3d at 872; *Allah v. Al-Hafeez*, 226 F.3d 247, 251 (3d Cir. 2000) (allowing free exercise claim for only nominal damages to proceed). Specifically, Jacobs was allegedly prevented from practicing her religion (which she wanted to do by wearing clothing expressing her beliefs), while Dresser was allegedly (1) prevented from expressing his individuality via his clothing, and (2) required to engage in an act of conformity by wearing the school uniform—both of which, he claims, violate the teachings of his religion. The merits of these free exercise claims will be discussed in Part III.

## C.   Due Process

**[4]** Finally, Plaintiffs allege that their due process rights were violated when several schools in the District—including Liberty, Bridger, Garside, and Glen Taylor—instituted school uniform policies without complying with the parental survey requirements contained in the original Regulation. Because the students at these schools were allegedly deprived of a cognizable liberty interest in free speech as a result of the school uniform policies, they too have standing to bring a non-moot

claim for nominal damages. *See Lujan*, 504 U.S. at 560-61; *Bernhardt*, 279 F.3d at 872; *Carey*, 435 U.S. at 266 ("[T]he denial of procedural due process [is] actionable for nominal damages without proof of actual injury."). The merits of these due process claims will be discussed in Part IV.

Because at least one plaintiff has alleged a viable claim for at least nominal damages with respect to each constitutional issue, our justiciability inquiry ends there,[20] and we proceed to the merits of their claims.

## II.   Free Speech Claims

Plaintiffs raise three speech-related claims. First, Plaintiffs contend that the District's school uniform policies (which prohibit students from displaying any printed messages on their clothing save for, in some cases, the school logo) unconstitutionally restrict students' rights to engage in "pure speech" while in school. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("[S]tudents [do not] . . . shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). This claim is best exemplified by Liberty's refusal to allow Jacobs to wear t-shirts containing written messages expressing her religious beliefs in school.[21] Second, Plaintiffs claim that the uniform policies unconstitutionally restrict students' rights to engage in "expressive conduct." *See id.* This claim is best exemplified by Bridger's refusal to allow Dresser to express his individuality (and his objection to forced uniformity) by wearing clothing different from his classmates.[22] Third, Plaintiffs claim that requiring

---

[20]Specifically, because we find such relief inappropriate on the merits, we need not consider (and, thus, do not decide) whether Plaintiffs' requests for declaratory and injunctive relief are justiciable.

[21]Such conduct is unquestionably protected by the First Amendment. *See Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001).

[22]We need not decide whether such conduct is imbued with sufficient communicative intent to be protected by the First Amendment. *See Spence*

students to wear a uniform amounts to unconstitutional "compelled speech." *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *see also supra* note 18. This claim is best exemplified by Dresser's contention that he is being forced to convey a message of uniformity (with which he strongly disagrees) by wearing the same clothing as his classmates.

We agree with the district court that none of Plaintiffs' free speech claims survive summary judgment. *Ballen v. City of Redmond*, 466 F.3d 736, 741 (9th Cir. 2006) (reviewing grant of summary judgment in free speech case de novo). We reach this conclusion because, as explained in more detail below, the District's encroachment upon its students' rights to free speech and expression via its content-neutral school uniform policies need only survive intermediate scrutiny to be constitutional—a level of scrutiny we find the uniform policies easily withstand. Moreover, enforcement of the mandatory uniform policies does not amount to "compelled speech" because, under the circumstances, it is unlikely anyone viewing a uniform-clad student would understand the student to be communicating a particular message via his or her mandatory dress.

## A.   Pure Speech and Expressive Conduct

### 1.   The District's School Uniform Policies Need Only Withstand Intermediate Scrutiny to be Constitutional

The court below concluded that the District's uniform policies did not infringe upon students' rights to engage in pure

---

*v. Washington*, 418 U.S. 405, 409 (1974) (per curiam). Rather, we follow the Fifth Circuit's lead and assume (without deciding) that wearing clothing different from one's classmates is sufficiently expressive of a student's views about non-conformity to merit First Amendment protection. *See Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 285-86 (5th Cir. 2001); *Canady*, 240 F.3d at 440-41 & n.3.

speech or expressive conduct because the policies withstood *intermediate scrutiny*.[23] *Jacobs v. Clark County Sch. Dist.*, 373 F. Supp. 2d 1162, 1181, 1185-87 (D. Nev. 2005). Plaintiffs take issue with this analysis from the outset, arguing that applying intermediate scrutiny to student speech is foreclosed by *Chandler v. McMinnville School District*, 978 F.2d 524 (9th Cir. 1992). Specifically, they argue that, under *Chandler*, speech that is neither "vulgar, lewd, obscene, [or] plainly offensive" nor "school-sponsored"—like the speech Plaintiffs wish to engage in here—must be analyzed under the *stricter* standard the Supreme Court utilized in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509 (1969),[24] and, most importantly, that *Chandler* leaves room for no other alternative.

Plaintiffs' argument is superficially appealing. *Chandler* laid out three categories of student speech—"(1) vulgar, lewd, obscene, and plainly offensive speech, (2) school-sponsored

---

[23]Intermediate scrutiny's precise contours vary slightly depending upon which constitutional right is at issue. In the First Amendment context, intermediate scrutiny takes the form of the "*O'Brien* test" for restrictions on expressive conduct, *see United States v. O'Brien*, 391 U.S. 367, 376-77 (1968), and the "time, place and manner test" for viewpoint- and content-neutral restrictions on pure speech, *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661-62 (1994). *See also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984) (confirming that the two tests are, in essence, identical).

[24]That is, that the restriction is unconstitutional unless the school can show that "engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.' " *Id.* (quoting *Burnside v. Byers*, 363 F.2d 744, 749 (5th Cir. 1966)). Although *Tinker* did not equate its "substantial interference" test with the "strict scrutiny test" that is now commonly used in First Amendment cases (perhaps because that terminology was not in common parlance at the time, *see First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (earliest Supreme Court case using this terminology in the free speech context)), Plaintiffs' argument rests on the "substantial interference" test being more difficult to withstand than the intermediate scrutiny test.

speech, and (3) speech that falls into neither of these categories"—and explained that speech in the first category should be analyzed under *Bethel School District Number 403 v. Fraser*, 478 U.S. 675 (1986), speech in the second category should be analyzed under *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), and speech in the third category should be analyzed under *Tinker*, 393 U.S. at 513-14. *See* 978 F.2d at 529.

As both parties concede, Plaintiffs' speech falls into neither of the first two categories. Plaintiffs thus argue that, just as the policy in *Tinker* was found unconstitutional because allowing students to wear black armbands in silent protest would not "substantially interfere with the work of the school or impinge upon the rights of other students," 393 U.S. at 509, the policy here (i.e., forbidding students from wearing their choice of clothing to school) should be found unconstitutional because it fails *Tinker*'s "substantial interference" test, as well.

What Plaintiffs miss—but the district court and one of our sister circuits have correctly recognized—is a key flaw in this logic. *See Canady v. Bossier Parish Sch. Dist.*, 240 F.3d 437, 441-43 (5th Cir. 2001); *Jacobs*, 373 F. Supp. 2d at 1175-81. While *Chandler* certainly says that all speech in the third category must be analyzed *under Tinker*, it does not say that all speech in this category has to be evaluated at the same level of scrutiny as that ultimately *used* in *Tinker*. In other words, while *Chandler* dictates that *Tinker* must guide our analysis of this case, it does not require us to blindly apply the standard employed therein. We thus start by carefully examining what the *Tinker* decision does—and, even more importantly, what it *does not*—say.

### a. *Tinker* Is Silent About How Content-Neutral Regulations of Pure Speech and Regulations Affecting Expressive Conduct Should be Evaluated

In *Tinker*, a group of students had arranged to wear black armbands to school to protest the involvement of the United States in the Vietnam War. 393 U.S. at 504. Upon learning of this plan, the Des Moines Independent School District adopted a policy prohibiting students from wearing such armbands, apparently fearing the disturbance they might cause. *Id.* at 504, 508. When the students were suspended for violating the no-armband policy, they filed suit, arguing that the policy violated their rights to free speech under the First Amendment. *Id.* at 504.

The Supreme Court agreed, holding that, "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. The Court further explained:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Id.* at 508-509 (internal citation omitted).

**[5]** In short, the Court made clear that suppressing the expression of unpopular or controversial opinions—even in the name of avoiding potential in-school disturbances—was a violation of the First Amendment unless the school could show that, absent such suppression, the school's orderly operation would be "materially and substantially" compromised. *Id.* at 509.

**[6]** Despite Plaintiffs' attempt to read *Tinker* more broadly, this is *all Tinker* expressly holds. Two things are notable about this limited holding. First, as the Court itself made clear, its "substantial interference" test applies only to restrictions on "pure speech," and does not necessarily apply to school policies placing incidental restrictions on expressive conduct. *See id.* at 507-08 ("The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment."); *King v. Saddleback Jr. Coll. Dist.*, 445 F.2d 932 (9th Cir. 1971) (declining to employ *Tinker* analysis to student's claim that policy disallowing long hair for male students violated the First Amendment). Thus, *Tinker* leaves unresolved the question of how restrictions upon expressive conduct in schools should be evaluated.[25] *But see generally Texas v. Johnson*, 491 U.S. 397, 406 (1989) ("The government generally has a freer hand in restricting expressive conduct than it has in restricting [pure speech].").

**[7]** Second, the holding itself extends only to viewpoint-*based* speech restrictions, and not necessarily to viewpoint-*neutral* speech restrictions. Although these two terms of art had not yet been used by the Supreme Court when *Tinker* was decided in 1969, *see Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976), the *Tinker* opinion makes clear that the Court's principal objection to the armband prohibition was

---

[25]We take up this as-yet unresolved question in Part II.A.1.c.

that it was motivated by a "desire to avoid the discomfort and unpleasantness that . . . accompany an unpopular *viewpoint*." 393 U.S. at 509 (emphasis added). In essence, the Court found the armband prohibition unconstitutional *not* simply because it worked to prohibit students from engaging in a form of pure speech, but because it did so based on the *particular opinion* the students were espousing. *Id.* at 510-11 (finding it significant "that the school authorities did not purport to prohibit the wearing of all symbols of political or controversial significance, . . . [but only] the wearing of armbands . . . worn to exhibit opposition to this Nation's involvement in Vietnam").

Although a slightly more expansive reading of *Tinker* suggests that its mode of analysis should also be used when a school's regulation is content-based (not only when it is viewpoint-based),[26] no reading of *Tinker* suggests that viewpoint- and content-*neutral* restrictions on student speech should also be subjected to "*Tinker* scrutiny." Indeed, neither this court nor the Supreme Court has ever analyzed a content-neutral restriction on student speech under *Tinker*; rather, the *Tinker* test has only been employed when a school's restrictions have been based, at least in part, on the particular messages students were attempting to communicate.[27]

---

[26]As Supreme Court jurisprudence since *Tinker* has made clear, viewpoint-based and content-based restrictions on speech are, for the most part, equally pernicious and, thus, restrictions of either variety must ordinarily be subjected to the same degree of scrutiny. *See, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 544 (2001); *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1055 (9th Cir. 2000) (both viewpoint-based and content-based speech restrictions trigger strict scrutiny).

[27]*See Tinker*, 393 U.S. at 509; *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir. 2006) (students suspended for signing petition criticizing football coach); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001) (student expelled for showing teacher poem he wrote containing imagery of violent death and suicide); *Chandler*, 978 F.2d at 529 (students prohibited from wearing buttons containing the word "scab" during a teacher strike); *Karp v. Becken*, 477 F.2d 171 (9th Cir. 1973) (student sus-

It is thus our view that *Tinker* says nothing about how viewpoint- and content-neutral restrictions on student speech should be analyzed, thereby leaving room for a different level of scrutiny than that employed in either *Bethel*, *Hazelwood*, or *Tinker* when student speech is restricted on a viewpoint- and content-neutral basis. *Accord Canady*, 240 F.3d at 441-43.[28]

### b.  District's School Uniform Policies Are Viewpoint- and Content-Neutral

Before turning to precisely what level of scrutiny that should be, we pause to explain why we find the school uniform policies at issue in this case to be both viewpoint- and

---

pended for attempting to distribute signs protesting school's refusal to renew an English teacher's contract); *Hatter v. L.A. City High Sch. Dist.*, 452 F.2d 673 (9th Cir. 1971) (students suspended for distributing leaflets and wearing tags opposing school's chocolate drive).

To our knowledge, every other circuit has applied *Tinker* in this manner, as well. *See, e.g.*, *Guzick v. Drebus*, 431 F.2d 594 (6th Cir. 1970) (applying *Tinker* when student suspended for refusing to remove an anti-war button), *cert. denied*, 401 U.S. 948 (1971); *Scoville v. Bd. of Educ. of Joliet High Sch. Dist. 204*, 425 F.2d 10 (7th Cir. 1970) (applying *Tinker* when students expelled for distributing a non-school-sponsored newspaper critical of the school); *see also Behymer-Smith v. Coral Acad. of Sci.*, 427 F. Supp. 2d 969 (D. Nev. 2006) (applying *Tinker* when student prohibited from reciting poem containing the words "hell" and "damn").

Although the Supreme Court recently suggested that there are some instances in which even *content-based* restrictions may be analyzed under a less demanding standard than that used in *Tinker*, *see Morse v. Frederick*, 127 S. Ct. 2618 (2007) (upholding school's ban on sign reading "Bong Hits 4 Jesus" even though it did not "substantially disrupt the work and discipline of the school"), the *Morse* holding in no way contradicts our holding here—i.e., that *content-neutral* speech restrictions need not withstand *Tinker* scrutiny either.

[28]This conclusion does not contradict *Chandler*, as Plaintiffs contend, but merely recognizes that there exists a fourth category of student speech that had not been explored by either this court or the Supreme Court prior to *Chandler* and, thus, was left unaccounted for in that case's recitation of student speech law.

content-neutral[29] and, thus, deserving of a different level of scrutiny than that applied to the viewpoint-based policy in *Tinker*.

[8] On its face, the portion of the Regulation authorizing schools to implement mandatory uniform policies is aimed at "increasing student achievement, promoting safety, and enhancing a positive school environment." Nothing in the Regulation's language suggests it was directed at the type of messages or specific viewpoints previously conveyed by students' wardrobe choices; indeed, the record evidence unambiguously indicates that the District's purpose in enacting the Regulation was to further the Regulation's stated goals, not to suppress the expression of particular ideas.[30] For example, the referendum sent to parents listing the advantages and disadvantages of the proposed uniform policy included as potential advantages: (1) "Promot[ing] safety by reducing the ability to hide weapons, drugs or alcohol"; (2) "Allow[ing] students and staff to focus more attention to increasing student achievement"; (3) "Eliminat[ing] dress differences that emphasize different income levels"; and (4) "Simplif[ying] daily school preparation and maintenance for families." None of the proposed advantages related to the "benefits" of preventing students from expressing unpopular views or communicating about particular subjects via their clothing choices.

Of course, while evidence of a viewpoint- and content-

---

[29]From this point forward (unless otherwise noted), we use the term "content-neutral" to capture the dual concepts of viewpoint-neutrality and content-neutrality, and do the converse with the term "content-based." *See supra* note 26 (explaining that viewpoint- and content-based speech restrictions are equally disfavored in First Amendment jurisprudence and, thus, are interchangeable insofar as they are both subject to the same degree of judicial scrutiny).

[30]*See Turner*, 512 U.S. at 642 ("[T]he principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys." (internal quotation marks, citation, and alterations omitted)).

neutral purpose strongly suggests that a regulation is, in fact, content-neutral, mere assertion of a benign purpose is insufficient to *conclusively establish* a regulation's content-neutrality. *Turner*, 512 U.S. at 642. Here, Plaintiffs argue that, despite the District's stated purposes, the Regulation is *not* content-neutral because it allows student clothing to contain the school logo—an allowance that, in Plaintiffs' view, sanctions expression of messages touting the District's schools, but not messages relating to any other topic or viewpoint.

At first blush, Plaintiffs' argument seems viable. Indeed, if the Regulation allowed for school uniforms that consisted *only* of plain-colored clothing without any words, logos, or printed material whatsoever, Plaintiffs' argument against the Regulation's content-neutrality would almost certainly fall flat. As it stands, however, Plaintiffs have at least a colorable claim that, by allowing student clothing to contain school logos, the Regulation reflects an impermissible content-based (and, indeed, viewpoint-based) preference for expressions of school pride.

**[9]** While the District could have steered far clear of the First Amendment's boundaries by foregoing the logo provision entirely, we nevertheless conclude that allowing students' otherwise solid-colored clothing to contain a school logo—an item expressing little, if any, genuine communicative message—does not convert a content-neutral school uniform policy into a content-based one.

Indeed, the District's very narrow exception to its otherwise content-neutral school uniform policy is a far cry from those regulations previously found by the Supreme Court to be content-based. *See, e.g.*, *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) (statute restricting cable companies' dissemination of sexual programming); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) (ordinance banning commercial handbills on news racks but allowing newspapers); *Boos v. Berry*, 485 U.S. 312 (1988)

(statute prohibiting display of signs critical of a foreign government near a foreign embassy); *Carey v. Brown*, 447 U.S. 455 (1980) (statute prohibiting all picketing in residential neighborhoods except labor picketing tied to a place of employment); *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92 (1972) (similar); *see also ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784 (9th Cir. 2006) (ordinance prohibiting speech soliciting donations, "charity, business or patronage").

**[10]** Moreover, "[w]hatever marginal expression wearing [a school] logo implicates, it does not rise to the level of expression to implicate concerns of viewpoint [non-] neutrality." *Long v. Bd. of Educ. of Jefferson County, Ky.*, 121 F. Supp. 2d 621, 625 n.5 (W.D. Ky. 2000). The content-based/content-neutral dichotomy is not grounded in the text of the First Amendment itself, but was created by the Supreme Court as a tool for distinguishing those regulations that seek to advance "legitimate regulatory goals" from those that seek to "suppress unpopular ideas or information or to manipulate the public debate through coercion rather than persuasion." *Turner*, 512 U.S. at 641. Here, Plaintiffs put forth no evidence that the Regulation's logo allowance was an attempt by the District to inundate the marketplace of ideas with pro-school messages or to starve that marketplace of contrary opinions; rather, all evidence suggests that the District considered the logo to be an identifying mark, not a communicative device.

**[11]** We thus decline Plaintiffs' invitation to take the term "content-based" to its literal extreme, and we hold that the District's school uniform policies are content-neutral despite their allowances for clothing containing school logos.[31]

---

[31]We also reject Plaintiffs' argument that the Regulation is viewpoint-based because it allows students to convey messages of conformity, but prohibits students like Dresser from expressing their views about non-conformity. First, it is unlikely students complying with a school uniform policy would be viewed by others as communicating their approval for conformity, *see Spence*, 418 U.S. at 410-11, thus undermining Dresser's

### c.  Intermediate Scrutiny Is the Appropriate Standard

As discussed above, the school uniform policies at issue here implicate the First Amendment only insofar as they place content-neutral restrictions on students' pure speech and place incidental restrictions on students' expressive conduct.[32] Because neither type of restriction is governed by *Tinker*, *see supra* Part II.A.1, we must now decide how to evaluate the constitutionality of these policies.

**[12]** Outside the school speech context, the Supreme Court has repeatedly held that a law restricting speech on a viewpoint- and content-neutral basis is constitutional as long as it withstands intermediate scrutiny—i.e., if: (1) "it furthers an important or substantial government interest"; (2) "the governmental interest is unrelated to the suppression of free expression"; and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner*, 512 U.S. at 661-62. The same is true of a regulation that has an incidental effect on expressive conduct. *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968).[33]

---

argument that his school's uniform policy facilitates communication of conformist messages at all. Second, under Dresser's logic, *any* policy requiring students to behave like their fellow students could be seen as favoring conformity and disfavoring non-conformity, yet nobody would seriously contend that requiring students to raise their hands before speaking, being polite to classmates, or—perhaps most relevant to this case— wearing a gym uniform, would be a viewpoint-based "speech" restriction containing an implicit preference for conformist "expression."

[32]Notably, these restrictions apply *only* during the school day and do not limit *all* speech, just "speech" that is communicated via students' clothing.

[33]*O'Brien* contemplates a fourth prong of the intermediate scrutiny analysis—namely, that the regulation be within the government's power to enact. 391 U.S. at 377. Because Plaintiffs do not question the District's power to implement mandatory school uniform policies under N.R.S. § 392.458, no further discussion of this prong is necessary. *Accord Littlefield*, 268 F.3d at 286.

**[13]** We agree with the district court that this same level of scrutiny should extend to the school speech context. *See Jacobs*, 373 F. Supp. 2d at 1181; *accord Canady*, 240 F.3d at 443.[34] Applying intermediate scrutiny to school policies that effect content-neutral restrictions upon pure speech or place limitations upon expressive conduct (or, as is the case here, do both) not only strikes the correct balance between students' expressive rights and schools' interests in furthering their educational missions, but, as the Fifth Circuit explained, is entirely consistent with the Supreme Court's other school speech precedents, not to mention the remainder of the Court's First Amendment jurisprudence. *See Canady*, 240 F.3d at 442-43.[35]

**[14]** Accordingly, if the District's school uniform policies advance important government interests unrelated to the suppression of free speech, and do so in ways that effect as minimal a restriction on students' free expression as possible,[36]

---

[34]If anything, the scrutiny should be even *less* demanding, as "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings, and . . . the rights of students must be applied in light of the special characteristics of the school environment." *Morse*, 127 S. Ct. at 2622 (internal quotation marks and citations omitted). Because we find that the District's school uniform policies withstand intermediate scrutiny, however, we have no occasion to consider whether an even more lenient standard would be consistent with the Constitution.

[35]Although we have never applied intermediate scrutiny in the student speech context, we have recently suggested that the standard might be appropriate for "assessing content-neutral regulations that restrict [student] speech or inherently expressive conduct." *See Pinard*, 467 F.3d at 759 n.1 (declining to apply intermediate scrutiny because parties did not brief the issue, but inviting parties to explore that issue on remand).

[36]While "the incidental restriction on alleged First Amendment freedoms [must be] no greater than is essential to the furtherance of [the government's] interest, . . . a regulation need not be the *least* speech-restrictive means of advancing the [g]overnment's interests," *Turner*, 512 U.S. at 662 (emphasis added); it need only promote "a substantial government interest that would be achieved less effectively absent the regulation," *id.* (internal quotation marks and citations omitted).

then the uniform policies should be upheld. We now turn to whether those criteria are satisfied here.

### 2.   Applying Intermediate Scrutiny

#### a.   School Uniform Policies Further Important Government Interests

The District claims its uniform policies further three important state interests: (1) "increasing student achievement"; (2) "promoting safety"; and (3) "enhancing a positive school environment."[37] The District supports its claim with affidavits from school personnel confirming that the school uniform policies were implemented with these purposes in mind and that the policies have, in fact, been effective in advancing these goals.

**[15]** Plaintiffs do not contend that the District's stated interests are unimportant or insignificant. Instead, they argue that, even though these interests may be laudable, the District's *real* justification for its uniform policies was its goal of "visible conformity"—an interest Plaintiffs argue is *not* important or substantial. But this is not how the intermediate scrutiny test works. Indeed, a court's job in evaluating a policy under this test's first step is to determine whether *the government's stated goals* qualify as important or substantial. *See Turner*, 512 U.S. at 664 (specifically, the court must determine whether the government's evidence "demonstrate[s] that the recited harms are real, not merely conjectural and that the regulation will in fact alleviate these harms in a direct and material way"). Whether those stated goals are mere pretexts for

---

[37]The stated purpose of the dress code was not simply to "promote 'school spirit.' " The dissent relies on the affidavit of Donald Jacobs for this assertion, but such reliance is not appropriate on summary judgment, and, in any event, the affidavit certainly does not constitute the "stated purpose" of the dress code. The actual purpose of the dress code—student achievement, safety, positive school environment—is stated explicitly in the regulation and reflects important government interests.

a more insidious government purpose is taken up in the second and third steps of the analysis. *See id.*; *O'Brien*, 391 U.S. at 377-80.

**[16]** Here, the government's stated goals unquestionably qualify as "important." *See Canady*, 240 F.3d at 443-44 (finding comparable goals sufficiently important to withstand intermediate scrutiny); *Blau v. Fort Thomas Public Sch. Dist.*, 401 F.3d 381, 391-92 (6th Cir. 2005) ("[B]ridging socio-economic gaps between families within the school district, focusing attention on learning, increasing school unity and pride, enhancing school safety, promoting good behavior, reducing discipline problems, improving test scores, improving children's self-respect and self-esteem, helping to eliminate stereotypes and producing a cost savings for families . . . are all important governmental interests [served by a school uniform policy]."). Indeed, it is hard to think of a government interest more important than the interest in fostering conducive learning environments for our nation's children.

**[17]** Additionally, not only do affidavits from District administrators indicate that the school uniform policies have been effective in achieving the Regulation's three goals—which itself is evidence that the contemplated "harms are real" and that the policies do "in fact alleviate these harms in a direct and material way," *Turner*, 512 U.S. at 664—the Department of Education has also acknowledged the efficacy of school uniforms in advancing such state interests. *See* U.S. Dep't of Ed. Manual on Sch. Uniforms (1996), *available at* http://www.ed.gov/updates/uniforms.html.**[38]** In the absence of

---

**[38]**This manual lists as the potential benefits of school uniform policies:

- Decreasing violence and theft—even life-threatening situations—among students over designer clothing or expensive sneakers;

- Helping prevent gang members from wearing gang colors and insignia at school;

*any* evidence from Plaintiffs that the uniform policies fail to advance the important government interests of increasing student achievement, enhancing safety, and creating a positive school environment, we conclude that the first prong of the intermediate scrutiny test is satisfied.

### b.  The District's Interests Are Unrelated to the Suppression of Free Expression

Because the District's stated interests are "unrelated to the suppression of free expression," we conclude that the second prong of the intermediate scrutiny test is satisfied, as well. *See Turner*, 512 U.S. at 662; *O'Brien*, 391 U.S. at 377.

[18] On their face, the District's goals have nothing to do with quelling speech or limiting expression. *Accord Castorina ex rel. Rewt v. Madison County Sch. Bd.*, 246 F.3d 536, 548 (6th Cir. 2001) (Kennedy, J., concurring) ("[A] stable, disruption-free educational environment is a substantial government interest . . . unrelated to the suppression of student expression."). Additionally, the record is devoid of any evidence suggesting that the District's stated goals were mere pretexts for its *true* purpose of preventing students from expressing their views on particular subjects, such as support for a particular faith (in Jacobs's case) or opposition to conformity (in Dresser's case). The District may have known that views like these would be *incidentally* suppressed because of its schools' uniform policies; however, its *reasons* for enacting the uniform policies were—as far as the record reveals—entirely divorced from preventing student speech.

---

- Instilling students with discipline;
- Helping parents and students resist peer pressure;
- Helping students concentrate on their school work; and
- Helping school officials recognize intruders who come to the school.

**[19]** Again, the referendum sent home to parents is telling. Although the District acknowledges in this referendum that its school uniform policies would limit student creativity and restrict students' freedom to express themselves in non-violent ways, it lists these effects in the "Cons - Disadvantages" column, thus implying that the District enacted the Regulation authorizing school uniforms not *because of*, but *in spite of*, the impact school uniform policies would have on students' expressive opportunities. We thus conclude that the District's interests are not pretexts for an underlying desire to limit free speech but, rather, are directed only at creating an educational environment free from the distractions, dangers, and disagreements that result when student clothing choices are left unrestricted. *Cf. City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (expressing less First Amendment concern regarding policies "aimed not at the content" of the forbidden speech, but rather at the "secondary effects" of that speech).[39]

### c.   The District's School Uniform Policies Do Not Restrict More Speech Than Necessary

The third prong of the intermediate scrutiny test has been stated in several forms but, for purposes of this case, it focuses on whether the regulation "leave[s] open ample alternative channels" for student communication. *Colacurcio v. City of Kent*, 163 F.3d 545, 551 (9th Cir. 1998).

---

[39]We reject Plaintiffs' argument in response—i.e., that a school policy that purports to regulate conduct, but "specifically includes a prohibition on all messages in the actual text of the policy," is necessarily related to the suppression of communication. To start, the Regulation nowhere references "messages" or "writing" in its text. Although it *does* limit students' clothing choices to plain-colored (or school logoed) clothing, and this *does* prevent students' clothing from containing written messages, if preventing expression of such messages were the primary aim of requiring clothing to be solid-colored, then striped, polka-dot, or plaid clothing would have been permitted, as would clothing of *all* colors, not just a select few.

**[20]** As the district court appropriately noted, although the school uniform policies may limit students' abilities to express themselves via their clothing choices, "students may continue to express themselves through other and traditional methods of communication throughout the school day." For example, students are still permitted (if not encouraged) to have verbal conversations with other students, publish articles in school newspapers, and join student clubs. Moreover, even a student's ability to communicate through his or her choice of clothing is not *completely* curtailed, as students are still permitted to choose what clothing to wear after school, on weekends, and at non-school functions.

**[21]** Because the District's uniform policies limit only one form of student expression (while leaving open many other channels for student communication) and apply during the narrowest possible window consistent with the District's goals of creating a productive, distraction-free educational environment for its students,[40] the District's uniform policies are a narrowly-tailored way of furthering the District's pedagogical goals without infringing upon students' First Amendment rights any more than is necessary to achieve these goals. *See Turner*, 512 U.S. at 661-62; *O'Brien*, 391 U.S. at 376-77. Accordingly, the policies withstand intermediate scrutiny and do not unconstitutionally abridge a student's rights under the First Amendment to engage in free speech while at school.

## B.  Compelled Speech

Plaintiffs next argue that the District's uniform policies infringe upon students' First Amendment rights because they compel students to express support for conformity—a message with which students like Dresser disagree.[41] Although the

---

[40]The Regulation limits the uniform policy's enforcement to *only* "regular school hours while in attendance at the school or school approved functions."

[41]Because Dresser is the only plaintiff who claims that, by being required to wear his school uniform, he was compelled to communicate a message with which he disagreed, we analyze Plaintiffs' compelled speech argument by considering only Dresser's allegations.

district court did not address this argument in its order granting summary judgment, Plaintiffs *did* raise the argument both to the district court and in their opening brief here; thus, we will consider the contention on appeal. *Donovan v. Crisostomo*, 689 F.2d 869, 874 (9th Cir. 1982).

**[22]** Dresser contends that uniforms usually convey symbolic messages, *see, e.g.*, *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 504 (5th Cir. 2001) (wearing police uniform conveys message of government-sanctioned authority), and thus that, by requiring him to wear a school "uniform," Bridger compelled him to convey a symbolic message—here, support for conformity and community affiliation—against his will. We disagree. First, although there are times when "wearing a uniform is expressive, identifying the wearer with other wearers of the same uniform, and with the ideology or purpose of the group," *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 206 (2d Cir. 2004), wearing Bridger's school uniform (which, here, consists of nothing more than plain-colored tops and bottoms) can hardly be compared to wearing the type of "uniform" contemplated in *Kerik* —i.e., a white hooded gown that clearly identifies its wearer as a member of the Ku Klux Klan and, presumably, as a subscriber to its views.[42]

**[23]** Second, given both "the nature of [Dresser's] activity" and "the factual context and environment in which it was undertaken," the likelihood that a person viewing Dresser wearing his mandated school uniform would have understood Dresser to be conveying a message of conformity is extremely small. *Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (per curiam) (finding conduct to be expressive only when that

---

[42]This does not necessarily mean that a student choosing to defy a school's mandatory uniform policy would not be communicating a message others could understand; it means only that wearing a solid-colored top and khaki bottoms does not, itself, communicate a discernable message akin to that communicated by wearing Ku Klux Klan garb.

likelihood was "great"). Wearing a uniform does not involve written or verbal expression of any kind, *cf. Barnette*, 319 U.S. at 628-29, 642 (requiring students to pledge allegiance to the American flag each morning), it is passive rather than active, *cf. id.*, and if it conveys a message at all, that message is imprecise, rather than "particularized," *cf. Spence*, 418 U.S. at 411. *See Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1090-91 (3d Cir. 1995) (citing these reasons when concluding that requiring state corrections officers to wear American flag patch on their uniforms was not likely a form of compelled speech). Indeed, Dresser puts forth no evidence to suggest that, even though *every* student at Bridger was required to wear the uniform, a person observing these similarly clad students would understand any of them to be expressing a personal affinity for conformity. *See id.* at 1092.

Dresser's argument that Bridger's uniform policy amounts to a form of "compelled speech" thus fails. Indeed, Bridger does not force Dresser to communicate any message whatsoever—much less one expressing support for conformity or community affiliation—simply by requiring him to wear the solid-colored tops and bottoms mandated by its uniform policy. *Accord Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283-86 & n.8 (5th Cir. 2001).

**[24]** In sum, we conclude that none of Plaintiffs' speech-related rights were violated by the District's mandatory school uniform policies and, thus, summary judgment in the Defendants' favor on these claims was appropriate.

## III.   Free Exercise Claims

Plaintiffs next contend that the District's uniform policies violated their First Amendment rights to free exercise of religion. *See* U.S. Const. amend. I. Specifically, they claim that Liberty's uniform policy unconstitutionally forbade Jacobs from wearing shirts expressing her religious beliefs and that Bridger's refusal to grant Dresser an exemption from its uni-

form policy unconstitutionally forced Dresser to violate the anti-conformity teachings of his religion.

## A.  Jacobs's Free Exercise Claim

[25] Jacobs's free exercise claim fails for the simple reason that both the Regulation and the school uniform policy Liberty implemented thereunder were "valid and neutral law[s] of general applicability" and, as such, did not implicate the Free Exercise Clause at all. *See Employment Div., Or. Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990); *cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). There is no evidence in the record suggesting that Liberty was motivated to enact its uniform policy because its administrators "disapprove[d] of a particular religion or of religion in general." *City of Hialeah*, 508 U.S. at 532. Moreover, Liberty's policy prohibits students like Jacobs from wearing message-bearing t-shirts *not* because Liberty feared students would undertake to do so for religious reasons, but because Liberty did not want students to encounter *any* clothing-related distractions during the school day. *Id.*

Indeed, a school uniform policy like Liberty's is the quintessence of a "neutral [rule] of general applicability." *Smith*, 494 U.S. at 879. The policy applies to all students equally (regardless of the students' religious beliefs), and it prohibits conduct (i.e., wearing clothing in colors and styles other than that prescribed by the uniform policy) that presents no obvious impediments to the free exercise of any particular religion or religions. Thus, like other regulations that have been found to be "neutral" and "of general applicability,"[43] the District's

---

[43]*See, e.g*, *Smith*, 494 U.S. at 890 (law prohibiting ingestion of peyote valid even as applied to those whose religions required use of peyote in religious ceremonies); *Gillette v. United States*, 401 U.S. 437 (1971) (Selective Service System valid even as applied to those whose religions opposed a particular war on religious grounds); *Braunfeld v. Brown*, 366 U.S. 599 (1961) (plurality opinion) (Sunday-closing law valid even as

Regulation (and the individual uniform policies it authorizes) do not implicate the Free Exercise Clause.

## B.   Dresser's Free Exercise Claim

Although Dresser makes a somewhat different free exercise argument, our analysis is, in essence, the same.

Dresser contends that his school arbitrarily denied him a religious exemption from its mandatory uniform policy and that this denial itself violated his free exercise rights. As the district court concluded, Dresser is correct that his school was not permitted to inquire into the validity or orthodoxy of Dresser's religious beliefs when deciding whether or not to exempt him from its mandatory uniform policy. *See Jacobs*, 373 F. Supp. 2d at 1185 (citing *Littlefield*, 268 F.3d at 292-93). The district court, however, already struck the religious exemption on this ground—an aspect of its decision neither party appeals. *See id.*

[26] Thus, the only argument Dresser can make now (other than the argument that the district court's remedy for curing the Regulation's grant of "unfettered discretion" to school administrators impermissibly leaves the Regulation without *any* religious exemption whatsoever—an argument that is now moot)[44] is that he is entitled to at least nominal damages

applied to those whose religious practices compelled them to refrain from work on other days); *Prince v. Massachusetts*, 321 U.S. 158 (1944) (child labor law valid even as applied to mother whose religion required her to use her children to dispense literature in the streets); *cf., e.g.*, *City of Hialeah*, 508 U.S. at 527, 535 (ordinance prohibiting anyone from "unnecessarily kill[ing], torment[ing], tortur[ing], or mutilat[ing] an animal in a public or private ritual or ceremony" invalid because ordinance targeted a particular Santeria religious practice).

[44]After striking the Regulation's overly discretionary religious exemption, the district court noted that it would be possible for the District to include a valid religious exemption in its Regulation as long as the exemp-

based on Bridger's prior refusal to grant him an exemption from its uniform policy. As explained in the previous section, however, the District's school uniform policies are neutral laws of general applicability and, thus, even if Dresser's beliefs about non-conformity were sincerely held and religious in nature, *see Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994), he had no right under the Free Exercise Clause to a religious exemption. *Smith*, 494 U.S. at 879.

Accordingly, we conclude that the District's mandatory school uniform policies infringed upon neither Jacobs's nor Dresser's free exercise rights.[45]

---

tion included " 'narrow, objective, and definite standards' " to constrain school administrator discretion. *See id.* at 1185 & n.7 (quoting *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969)). Responding to this invitation, the District passed a re-revised regulation in August 2005, thus mooting Dresser's objection to Bridger's then-exemptionless school uniform policy. The District's revised regulation is not before the court; thus, we express no opinion regarding its constitutionality or the constitutionality of a uniform policy lacking any religious exemption.

[45]We reject Plaintiffs' contention that Jacobs and Dresser raise "hybrid rights" claims that should be subjected to strict scrutiny. The "hybrid rights" doctrine has been widely criticized, *see, e.g.*, *City of Hialeah*, 508 U.S. at 566-67 (Souter, J., dissenting) (explaining why doctrine is "ultimately untenable"); *Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993) (calling doctrine "completely illogical" and declining to recognize doctrine until Supreme Court expressly does so itself); *Littlefield v. Forney Indep. Sch. Dist.*, 108 F. Supp. 2d 681, 704 (N.D. Tex. Aug. 3, 2000) (refusing to apply doctrine in school uniform case because entire doctrine is likely based upon a misreading of *Smith*, 495 U.S. at 881-82), *aff'd* 268 F.3d 275 (5th Cir. 2001); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 12.3.2.3 at 1215-16 (2d ed. 2002) (calling doctrine's contours "unclear"), and, notably, no court has ever allowed a plaintiff to bootstrap a free exercise claim in this manner, *see Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 557-58 (2004). We decline to be the first.

## IV. Due Process Claims

Plaintiffs' final contention is that their due process rights were violated because they were each made subject to a mandatory school uniform policy that was implemented *without* following the parental survey procedures included in the original Regulation.[46]

We first clarify that Plaintiffs are *not* making the due process argument typically made in school policy cases—i.e., that District schools disciplined students like Jacobs and Terry for violating the mandatory uniform policies without first confirming, via "fundamentally fair procedures," that the alleged violations actually occurred. *Cf. Goss v. Lopez*, 419 U.S. 565, 574 (1975) (recognizing need for procedural due process before student can be suspended and thereby deprived of her "legitimate entitlement to a public education" and her interest in her "good name, reputation, honor, [and] integrity"). Jacobs and Terry admit they violated their schools' uniform policies and have never contended that they were disciplined—and, in Jacobs's case, repeatedly suspended—without being given fair warning of the prohibited conduct or an opportunity to explain their behavior. *See id.* at 579.

Instead, Plaintiffs make the novel argument that the District schools at issue violated due process when they acted in "complete defiance of their own regulations" and instituted

---

[46]That Regulation required any school that chose to implement a uniform policy to "survey all families at the school" and to only implement the policy if "at least fifty-one (51) percent of the surveys [were] returned [and there was a] seventy percent favorable response supporting school uniforms from the respondents."

According to Plaintiffs, Liberty initially implemented a uniform policy without conducting a parental survey at all, Garside did so despite failing to receive the required 51% response rate and 70% approval rate, and Glen Taylor did so by improperly aggregating a series of parental surveys so that the response and approval rates met the Regulation's requirements.

school uniform policies absent the requisite level of parental approval.

**[27]** As the district court correctly concluded, however, even if the manners in which these District schools implemented their uniform policies violated the *Regulation*,[47] they did not violate the *Fourteenth Amendment*. It has long been recognized that individuals have no due process right to participate in government policymaking. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 444-46 (1915) (due process not violated when taxpayer adversely impacted by new local ordinance was given no opportunity to be heard before ordinance was passed). Moreover, Plaintiffs provide no authority for their suggestion that a federal due process claim lies whenever a *local* entity deviates from its *own* procedures in enacting a *local* regulation.[48] Accordingly, although it might be preferable for schools to seek parental approval before instituting controversial school policies, and it might be a violation of *state law* for schools not to do so if a local statute or regulation so dictates,[49] the Due Process Clause in no way requires this. *See id.* at 445.

---

[47]And perhaps even N.R.S. § 392.458 (authorizing Nevada school districts to implement uniform policies, but only "in consultation with . . . parents and legal guardians of pupils who are enrolled in the district").

[48]Of course, if the local rule itself were required by due process, then a federal due process claim would surely lie. *See, e.g.*, *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 62 (1993) (requiring a locality to "afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture"). Here, however, that is not the case.

[49]*See Jacobs v. Clark County Sch. Dist.*, No. CV-S-04-1490-RLH (D. Nev. Nov. 10, 2004) (order granting preliminary injunction because Plaintiffs were likely to succeed on merits of *state law* statutory interpretation claims that District schools implemented mandatory uniform policies in violation of N.R.S. § 392.458 and the Regulation).

## CONCLUSION

We thus affirm the district court's grant of summary judgment in favor of the District. Neither the District's Regulation nor the individual school uniform policies implemented thereunder violate Plaintiffs' free speech, free exercise, or due process rights.

**AFFIRMED.**

---

THOMAS, Circuit Judge, dissenting:

Kim Jacobs wanted to wear a T-shirt to Liberty High School containing a message expressing her religious beliefs as a member of the Church of Jesus Christ of Latter-day Saints. When she did, she was suspended four times, for a total of twenty-five days, because the only messages allowed on shirts were those promoting the school.[1] She alleges that she was penalized academically, suffered emotional harm, and eventually was forced to transfer to another school.[2]

---

[1] The school policy stated that "Logos on tops will be excepted [sic] only if they are Liberty High School logos or designs." The affidavit of Donald Jacobs states that he was told that "the sole reasons for imposing discipline on Kim was that her shirts with religious messages did not conform to the Liberty School regulation that only allows pro-school messages on shirts." He further averred that he has "observed that other Liberty High School students wearing message bearing shirts, including those with slogans touting the school's athletic teams, have not been disciplined." He stated that he "was told that since these messages promoted the school, they were acceptable under the policy." The school has conceded that a design bearing a school logo with the universal "no" symbol through it (a circle with a diagonal line) would not be permitted under school policy.

[2] Although there are other plaintiffs and other claims, I will focus initially on Jacobs' claim because it demonstrates my fundamental difference with the analysis adopted by the district court and the majority.

The district court and the majority have determined, in very thoughtful opinions, that the school's ban on her speech need only withstand intermediate scrutiny to pass constitutional muster, and that it does in this case. However, this conclusion directly conflicts with *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and *Chandler v. McMinnville School District*, 978 F.2d 524 (9th Cir. 1992). It also represents a substantial rewriting and undermining of the First Amendment protections afforded by *Tinker*.

Therefore, I respectfully dissent.

I

As everyone agrees, *Chandler* governs the analysis of student speech in our Circuit. *Chandler* establishes three categories of student speech: (1) vulgar, lewd, obscene, and plainly offensive speech (analysis of which is governed by *Bethel School District Number 403 v. Fraser*, 478 U.S. 675 (1986)); (2) school-sponsored speech (analysis of which is governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988)); and (3) speech that does not fall into either of the first two categories (analysis of which is governed by *Tinker*). 978 F.2d at 529.

Everyone also agrees that the speech at issue in this case does not fall under either of the first two categories. Therefore, under *Chandler*, the analysis must be controlled by *Tinker*. *Id.* However, rather than applying the plain terms of *Chandler*, the district court and the majority have imported and imposed a new analytical framework that cannot be reconciled with Supreme Court jurisprudence, or with ours.

In examining student speech, the Supreme Court has consistently focused on the nature of the speech itself, as we recognized in *Chandler*. *Id.* If vulgar, lewd, obscene, and plainly offensive speech is at issue, the *Fraser* analysis applies, and the governmental regulation is reviewed in that context. When

school-sponsored speech is involved, the *Hazelwood* analysis applies. When issues of speech and other expressive conduct are involved, the *Tinker* analysis applies, and the governmental action is reviewed in that context. *Id.* In short, under the Supreme Court's analytical framework, and under ours, the initial inquiry is the character of the speech at issue. Only once that has been established do we examine the governmental response.

The government has, to my dismay, urged an approach— adopted by the district court and the majority—that amounts to little more than an analytical sleight of hand, a trick of misdirection. Rather than examining the nature of the speech, the majority has instead decided that the focus should be on the regulation of the speech. If the regulation is content- and viewpoint-neutral, the majority reasons, then the type of expressive conduct at issue is irrelevant. In that instance, regardless of the type of speech involved, a deferential level of scrutiny applies.

That reasoning, of course, is diametrically opposed to the teachings of *Fraser*, *Hazelwood*, and *Tinker*. One need only examine the facts of *Tinker* and *Chandler* to see the logical disconnect. In *Tinker*, the Supreme Court held that a school could not prohibit students from wearing black armbands. In *Chandler*, we held that a school could not prohibit students from wearing pro-teacher buttons. If we applied the Liberty High School uniform policy to those cases, that policy would have prohibited students in *Tinker* and *Chandler* from wearing those same armbands or buttons.[3] However, under the

---

[3]In fact, the assistant principal of Glen Taylor Elementary School informed another one of the plaintiffs in this case, Lona Finley, that her child's button, stating "say no to uniforms" violated the school's dress code as a "slogan or advertising on clothing which by [its] nature disrupt[s] the educational setting." One can imagine that the students in *Tinker* and *Chandler* would also have been so informed. Of course, Ms. Finley was also told that "[t]he standard student attire policy was *not* the reason Ms. Finley's child was required to remove the button." It was actually

majority's analysis, this would not have resulted in a constitutional violation because the regulations were content- and viewpoint-neutral. It is obvious that the majority's holding cannot be reconciled with *Tinker* and *Chandler*. It is the character of the speech, not the content of the governmental regulation that forms the framework of the First Amendment analysis in student speech cases.

## II

The analysis of this case should have been conducted under *Tinker*. In *Tinker*, the Supreme Court confirmed a student's right to free speech in public schools. In balancing that right against the state's interest in maintaining an ordered and effective public education system, the Court declared that a student's speech rights could only be curtailed if the speech: (1) would impinge on other students' rights; or (2) would result in a "substantial disruption of or material interference with school activities." 393 U.S. at 513-14.

Here, there is no dispute that Kim Jacobs' wearing of a T-shirt that contained pre-printed expressions of her religious faith would not impinge on the rights of other students. Nor is there any suggestion that her T-shirt could possibly have resulted in a substantial disruption or material interference with school activities. Plainly then, under the standard described in *Tinker*, the school's lengthy suspension of Jacobs violated her First Amendment rights.

---

because the metal pin fastener "presented a safety hazard and the button presented a disruption to the school environment." Even if Ms. Finley's child had selected a pin with the same slogan, but fastened it to his or her clothing with a "straight pin"—considered by Glen Taylor Elementary to be a safer option—the record still suggests that the button would be considered impermissible as a "disruption." This is clearly irreconcilable with *Chandler* and *Tinker*. The record also shows that students at the same school were allowed to wear shamrocks pinned on their shirts.

## III

Even if we were to adopt the majority's legal analysis and assume *Tinker* only applies to viewpoint- and content-neutral restrictions on student speech, the result in this case still cannot be sustained. The lynchpin of the majority's reasoning—that Liberty High School had a viewpoint- and content-neutral regulation—is unsupported, even by the limited record at hand. The school prohibits all messages on clothing, except for messages that support the school. The literal language of the rule describes logos and designs,[4] but the affidavits provided in this case indicate that other messages were allowed, so long as they expressed pro-Liberty sentiments.[5]

Confining messages to pro-government content cannot be said to be viewpoint- or content-neutral. A regulation is content based "if either the main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face." *ACLU v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006). Here, shirts with messages "touting the school's athletic teams" are permitted, while a shirt bearing an anti-school spirit message would be prohibited. A policy that allows students to wear messages that express support of the school, while prohibiting messages that oppose school policy cannot be considered content-neutral: such a policy is indubitably content-based. Indeed, expressing anti-government sentiments constitutes paradigmatic political speech. Nor can a policy become content-neutral merely because each student is forced to adopt the message. Thus, on the face of this record, the Liberty High School policy cannot be considered viewpoint- or content-neutral.

---

[4]Liberty High School's "Campus Wardrobe Basic Guidelines" provide that "[t]ops must be solid color plan [sic] red, white or navy blue," but that "[l]ogos on tops will be excepted [sic] only if they are Liberty High School logos or designs."

[5]For example, Jacobs' father observed that shirts printed with "slogans touting the school's athletic teams . . . were acceptable under the policy."

IV

Even assuming the majority's analysis is correct and intermediate scrutiny applies, the school uniform policies at issue here fail at step one of that analysis. As the majority agrees, a viewpoint- or content-neutral restriction on speech is constitutional if (1) "it furthers an important or substantial government interest;" (2) "the governmental interest is unrelated to the suppression of free expression"; and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661-62 (1994) (internal quotation marks omitted) (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

So what is the "important or substantial" government purpose here? It is not, as some have suggested in similar contexts, to reduce socio-economic divisions. Rather, the state purpose of the school uniform and printed message ban is to promote "school spirit." Assuming this is an important government purpose—an assumption indeed—the majority neglects to consider whether the record demonstrates that the school uniform policy actually furthers this interest.

The school argues that the imposition of mandatory school uniforms and the ban on expressive messages results in an improvement of the educational process in individual schools through increasing student achievement, promoting safety, and enhancing a positive school climate. There is no empirical evidence of this in the record, only conclusory affidavits filed by school officials. Indeed, the only empirical evidence in the record is that Kim Jacobs' academic performance suffered as the direct result of the imposition of the speech ban.[6] On this record, the governmental interest in promoting "school spirit"

---

[6]While Kim Jacobs did manage to keep her grades up despite being suspended for twenty-five days, she was penalized for the in-class work she was forced to miss.

cannot come close to outweighing Kim Jacobs' First Amendment rights.

### V

There are, of course, other issues in this case, and it is easy to be diverted by them. There is the broader question of freedom of dress. *See* Gowri Ramachandran, *Freedom of Dress: State and Private Regulation of Clothing, Hairstyle, Jewelry and Makeup, Tattoos, and Piercing*, 66 Md. L. Rev. 11 (2006). There are interesting and important questions about the legal difference between dress codes (which limit the universe of clothing options) and mandatory uniform policies (which define the universe of clothing). There is the question of whether, following a *Tinker* analysis of Jacobs' speech claims, her Free Exercise Clause claims should be subjected to strict scrutiny under a hybrid rights analysis. *See Miller v. Reed*, 176 F.3d 1202, 1207-08 (9th Cir. 1999). All of these issues, and more, form part of the larger question of the constitutionality of mandatory school uniforms.

However, in the present context, these are questions that need not be answered. The simple question for me is whether the district court and the majority properly rejected the traditional *Tinker* analysis. Because I believe the law of our Circuit mandates that *Tinker* applies, I would reverse the judgment of the district court and remand for a proper re-examination of the case under *Tinker*. I would not reach any of the other issues urged by the parties.

For these reasons, I respectfully dissent.